## Mary Newberry v. The State.

### No. 133. Decided May 13.

**Murder—Insanity.**—On the trial of a grandmother for the murder of one of her three infant grandchildren, murdered at the same time, to whom she was devotedly attached, where the defense was insanity and the evidence was conflicting but greatly preponderated in support of the plea, *held*, that a judgment of conviction should be set aside.

Appeal from the District Court of Johnson. Tried below before Hon. J. M. Hall.

The indictment in this case charged that appellant, " Mary Newberry, did, on the 14th day of July, 1891, with malice aforethought, kill Irvin Clifford Newberry, by cutting the throat of the said Irvin Clifford Newberry," etc.  At the trial, she was found guilty of murder in the first degree, with punishment assessed at a life term in the penitentiary.

The defense was insanity.  She was the grandmother of the murdered boy, Irvin Clifford Newberry, who was three years of age, and also of Della May Newberry, age seven years, and Nora Newberry, age five years, they being the children of her son, George Newberry.  George's wife, the mother of these children, had died some five months previous to the homicide.  After her death, defendant lived with and took care of these children, and the evidence shows that she was devotedly attached to them, and they to her.  On the night of the 14th of July, 1891, these children were all murdered, at the home of themselves and grandmother, each of their throats being cut from ear to ear with a knife.

The evidence is too voluminous to be reproduced in full.  In appellant's brief, filed in this case on appeal, we find a concise statement of all the most important facts established at the trial, and we give the same in illustration of the nature of the case and character of the proof adduced in support of the plea of insanity.  It is as follows:

The appellant is the mother of James Barnard and George Newberry, the latter being the father of the deceased children, George and Jim being half-brothers.  Appellant came to Texas about twelve years before the homicide, and lived with her brother, Sam Barnard, the first five or six years, then with her son James Barnard about six years, and upon the death of George Newberry's wife, about five months before the homicide, she went to his house to take care of his children, deceased, where she remained, staying with them alone, day and night, in a secluded country place, except on Sundays and at times on Saturday nights, when George would come and spend the night.  While with Sam Barnard, she suffered with frequent hurting upon the top of her head and spells of sick headache; was absent-minded, and had one spell of what the physician pronounced hysteria; at this time she shook like she had a severe chill, and cramped all over, and screamed as though in great pain, but had no fever.  During the six years she remained at Jim Barnard's she suffered almost continuously with the hurting upon top of head, and with frequent spells of severe sick headache, lasting from two to six days, during which she had but little mind; also had frequent spells of shaking, as though she had a chill, and with severe cramping spells; would sit in presence of strangers or of the family, or when she thought she was unobserved, and pick scabs off her flesh, or rub upon her neck till she rolled up particles of dirt, and would put the scabs or dirt in her mouth and eat them, while gazing at the floor; and when her attention was called to it, would deny it, while yet chewing upon the scab or dirt; would repeat

over and over whatever she attempted to tell, and repeat it differently every time, and when told of this would deny it; would when talking or attempting to narrate anything, suddenly change the subject with a sudden stare of the eye or twitching of her body; would frequently refuse to eat at the table for days at a time, claiming that she was not hungry, and then slip around to the safe and eat between meals, and when told of this would deny it while eating; would, for no cause, imagine that the whole family was mad at her, and fall out with all the family upon imaginary grounds; at one time in hot weather, went into a little saddle house, made a pallet of unclean saddle blankets and laid upon them all day, resisting all invitations of the family to come out and lie upon the bed, which was in a cool room. At one time, after the homicide, Mrs. Barnard, upon hearing a noise in her room, opened the door and found her in a nude condition, and being asked what she meant, she looked as though scared, and jumped in the bed. That all these symptoms grew upon her from year to year, and more perceptibly the last two or three years, until she was completely changed.

In early life she had good health, good memory, and was of a mild temper; but of recent years her health was bad, her memory very bad, and her temper violent. The place where she stayed with the children was a quarter to a half a mile from James Barnard's, situated in thick woods, with no attractions, James Barnard being her nearest neighbor; that her action in going there was voluntary; that George Newberry, in connection with a young man by the name of Planks, was farming on shares at James Barnard's, where they slept and ate; that appellant was kind and affectionate to the deceased children, and they to her. It was rumored in the neighborhood, that George Newberry had, just prior to the homicide, recovered a large sum of money from the railway company, but had only in fact gotten $200 or $300; that on the night of the homicide, about 3 o'clock a. m., appellant came to James Barnard's, barefooted and bareheaded, with nothing on but her night clothes, with collar of her gown bloody and a few spots of blood on her clothes elsewhere, as will be seen by inspection; her neck bloody, with a number of cuts or scratches on it; that she was in great distress of mind and greatly exhausted, and though the weather was very warm, she was shivering as if cold; that she then and thereafter, until after her trial in this case, in January, 1892, stated that two men had come and carried her out of the house and tied a rope around her neck at the gate, and that one of the men stayed with her, and choked her and cut upon her throat with a knife, while the other returned to the house and killed the children; that after they left, she went to the house and found them dead; that she sat down by them and raised one of them up against her knee; that she then left and came to Jim Barnard's; that she did not know the men, but thought they were white men; that upon the day of the confession she

has desired to plead guilty and die; frequently telling her attorneys so. That on February 18, 1892, she was adjudged insane and sent to the Terrell Asylum.

James Barnard, his wife and daughter, and Mrs. Sprague, from long observation, swore she was insane; D. R. Wallace, M. D., S. A. Greenwell, M. D., J. M. Towns, M. D., and T. C. Osborn, M. D., all testified to her insanity; while J. J. Williamson, M. D., J. D. Osborn, M. D., and W. P. Alexander, M. D., testified to her sanity; both Osborn and Williamson admitting, that assuming the truth of the facts in evidence, she was insane. John H. Boyd, from observation and conversations with her the day after the homicide; P. P. Stringer, from her manner of testifying on former trial; Mrs. Blanton and J. M. Williams, from observation occasionally for several years, gave it as their opinion that she was sane. Dr. John Preston, superintendent of the asylum, said he did not think her insane while he had her at Terrell, but would not say she was not insane at the time of homicide or trial; but assuming that she killed the children without a motive, she was in his opinion insane.

*Poindexter & Padelford* and *A. P. Taylor*, for appellant, filed a most able and elaborate brief, in which they contended: 1. That the evidence was wholly insufficient to show that the appellant committed the murder. 2. But if the evidence did show that she committed the deed, that then her insanity was clearly established, and she was not, and should not be held, responsible for the crime.

*R. L. Henry*, Assistant Attorney-General, for the State.

PER CURIAM.—Appellant, the grandmother, over 60 years of age, was convicted of the murder of her 3-year old grandson, and given a life term punishment in the penitentiary. At the same time and place the two sisters of deceased were also killed. Their ages were, respectively, 7 and 5 years. The children were taken from their beds at night, out into the yard, and their throats cut "from ear to ear." The grandmother and children lived alone, and were devotedly attached to each other. Several questions of more or less magnitude are urged for reversal of the judgment, but under the view taken of the case, we deem it unnecessary to discuss them. On the trial, in addition to the plea of not guilty, the insanity of the defendant was suggested, and became the controlling issue in the case. We have given the testimony that careful consideration which the gravity of the case and its involved issues demand at our hands.

After mature reflection, we are of opinion, that by the great preponderance of the testimony, the insanity of the defendant was clearly shown to have existed at the time of the homicide. She had been adjudged in-

sane in a proper legal proceeding, had been in the asylum for months, and brought therefrom, and placed upon the trial for this murder. While there is some conflict upon the issue of insanity, as well in the expert as the nonexpert testimony, yet the great preponderance of the evidence for the prosecution and defense clearly shows the defendant to have been insane at the time of the homicide as well as at the trial. The witnesses who testified as experts in behalf of the State to their belief of the sanity of the defendant, with one or two exceptions, were equally as certain of her insanity if, as a fact, she was the perpetrator of the horrible killing. If the defendant did the killing, the evidence, with but a slight contradiction, is that she was insane. That the children came to their death at the hands of defendant will admit of but shadowy doubt, if in fact it admits of any character of doubt. Had we the time, it would be interesting to review the testimony, and give the reasons for the conclusions we have reached, but the evidence is too voluminous to be incorporated in an opinion. Judgment is reversed and cause remanded.

*Reversed and remanded.*

Judges all present and concurring.